# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## March 14, 2006 Session

## STATE OF TENNESSEE v. HENRY ZILLON FELTS

### Direct Appeal from the Criminal Court for Sumner County
### No. 549-2003    Jane Wheatcraft, Judge

---

### No. M2005-01215-CCA-R3-CD - Filed August 25, 2006

---

Henry Zillon Felts, the defendant, was convicted of attempted first degree murder (Class A felony) and aggravated burglary (Class C felony). The defendant was sentenced to an effective sentence of twenty-one years at 100% in the Department of Correction. He now appeals as of right his convictions. After review, we affirm the judgments of conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

B. F. "Jack" Lowery, Lebanon, Tennessee, for the appellant, Henry Zillon Felts.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

In this case, the defendant was accused of aggravated burglary of his ex-wife's home for entering without her authority and with a loaded gun. The defendant then shot a guest in the home four times and, consequently, was charged with attempted first degree murder.

Kent Miller, the victim herein, testified that he first met Pam Felts, the defendant's ex-wife, at a basketball game. Miller's and Ms. Felts' relationship gradually grew into casual dating which usually involved their children being present. Miller stated that he and Pam Felts only had one date alone, a brief outing to hit golf balls. Shortly after Valentines Day of 2003, Miller had delivered a Valentine basket to Ms. Felts' residence when the defendant appeared outside. The defendant shouted questions from outside the house such as "who is it?" or "what is he doing there?" No

confrontation occurred as a result of this encounter. The defendant began to call the victim's home and cell phone numbers about three weeks prior to May 5. According to the victim, the defendant told him to stay away from Ms. Felts and made threats. On April 28, the defendant left a message on the victim's cell phone saying, "Mf, you have f–ked up."

On May 4, the victim and Ms. Felts devised a plan to leave the victim's truck at her house overnight. The avowed purpose was to show the defendant that Ms. Felts was "getting on with her life." On May 5, Ms. Felts brought the victim back to retrieve his truck. The victim learned that the defendant had been at Ms. Felts' house that morning and was very upset. The victim and Ms. Felts went into her kitchen. The victim heard a banging on the door and saw the defendant outside with a gun. The defendant then entered the house. The victim told Ms. Felts to call the police. The defendant pushed Ms. Felts aside and came toward the victim. The victim went into the living room and armed himself with a bat. When the defendant entered the room, the victim swung the bat once and hit the defendant in the head. The blow knocked the defendant back, and the victim heard gunfire. The victim swung again at the defendant's knees, then said he became dazed and heard more gunshots. The victim remembered hearing three shots but was actually shot four times. The victim fell to the floor and was unable to get up. The victim's last memory was of a paramedic speaking before the victim lapsed into a coma for three and one-half weeks. The victim acknowledged that the statement he gave to Detective Witherow during his convalescence varied somewhat from his testimony. The victim attributed the earlier variances to being "kind of in a fog."

On cross-examination, the victim stated he was aware that the defendant had lived with Ms. Felts during the latter part of 2002. He said that Ms. Felts had changed the locks to her house in January of 2003. The victim admitted telling Detective Witherow that he had placed the bat in the living room "just in case." The victim also told Detective Witherow that he had driven to Ms. Felts' house on May 5. The victim said he was unaware that Ms. Felts had scheduled a meeting with the defendant at 1:00 p.m. on May 5, 2003. The victim stated he may have told Ms. Felts that he could "take" the defendant in a fist fight.

Dean Hall was a paramedic who responded to Ms. Felts' house on May 5. He testified that he found the victim laying face up on the floor, pale in complexion, and with rapid breathing. The victim answered questions appropriately.

Shannon Helmig, an emergency medical technician, was also on the responding team. Ms. Helmig first went to the defendant and assessed his condition. The defendant told Ms. Helmig that he had shot a man who had hit him in the head with a baseball bat. After satisfying herself that the defendant was not in critical condition, she went to the victim. She stated that she observed the gunshot wounds of the victim, two in the chest, one in the groin area, and one in the left leg. She saw two exit wounds. Ms. Helmig said that, based on her experience, all the shots were fired from close range.

Penny Ross, a paramedic, tended to the defendant. She said he had a laceration over one eye, which was swollen and bleeding. The defendant's left knee had a contusion. She described the

defendant's condition as "very much alert" and aware that he had shot someone and that he had been hit with a baseball bat.

Randy Tope, a Hendersonville policeman, was one of the responding officers. He saw the defendant sitting on the lawn of a residence. Officer Tope also saw a gun at another location on the lawn. He stated that he stayed with Ms. Felts until 3:30 p.m. During that time, he took a statement from Ms. Felts.

Pam Felts testified that she and the defendant had been divorced since late 1999 or early 2000. She characterized their relationship as being "a roller coaster ride." During the periods that Ms. Felts was seeing the defendant, he stayed with her some nights and also maintained his residence in Mt. Juliet. The defendant paid Ms. Felts $500 per month for rent. The parties lived separately from September to December of 2002, but then resumed their relationship. In February of 2003, the defendant had Ms. Felts arrested for domestic assault. Ms. Felts then changed the locks at her residence and did not furnish the defendant with a key. The defendant, however, still stayed with Ms. Felts on some nights and continued paying her. Ms. Felts said the defendant was sometimes "intimidating" to her when he would "scream, curse, and stomp his feet." The defendant did not approve of Ms. Felts associating with the victim. She stated that the defendant had warned the victim to "get out of the middle of our relationship" and also told the victim, "I'm going to kick your ass."

On May 2, Ms. Felts placed the defendant's possessions on her porch during his absence. On May 4, she and the victim agreed to leave the victim's vehicle at Ms. Felts' house overnight although the victim did not stay there. Ms. Felts said this was intended as a signal to the defendant that she had begun a "dating, romantic type situation." Ms. Felts also called the defendant to ensure that he saw the victim's vehicle parked at her residence.

The defendant came to Ms. Felts' residence early on May 5. He placed calls to her which were at first ignored. Ms. Felts eventually answered the defendant and arranged to meet with him at 1:00 p.m. that day. The defendant then left. Ms. Felts transported the victim back to her house to retrieve his vehicle. While the victim and Ms. Felts were in her kitchen, the defendant returned and called on the phone. Ms. Felts stated that she handed the victim the telephone but did not know what the defendant said. She recalled that the victim laughed. The defendant entered the house by using a key. Ms. Felts denied ever having given the defendant a key since the locks were changed. The defendant came in quickly, holding a handgun. Ms. Felts heard the victim say, "Call the police." She also thought the defendant said, "Where is he?" She followed the defendant and saw the victim hit the defendant with a bat three times. The defendant and victim went out of Ms. Felts' view, and she heard a gun shot. She then ran into the garage and hid. She stated she heard four or five shots. While Ms. Felts was talking to the 9-1-1 operator, she saw the defendant in her neighbor's lawn. She stated that he was staggering and dropped the gun before sitting on the neighbor's door steps.

On cross-examination, Ms. Felts said her impression was that the defendant had the gun to get attention but not to shoot anyone. She affirmed that the defendant always paid her on the fifth

of each month. She said she had never given the defendant a notice to vacate other than placing his possessions outside. Ms. Felts also stated that the victim could have left the house when the defendant entered as there was no need to protect her.

Detective Jim Vaughn, of the Hendersonville Police Department, stated that he took possession of the defendant's gun. He identified it as a Bryco Arms, 9-mm semiautomatic pistol. The gun was jammed when Detective Vaughn found it. Detective Vaughn found the defendant's keys just inside the door of Ms. Felts' residence. One key fit the door lock that the defendant entered. Six empty casings were found in the house and one casing was in the pistol, indicating that seven shots were fired. Detective Vaughn stated that rolling papers and a substance appearing to be marijuana were recovered from the defendant's truck.

Sergeant James Lawson of the Hendersonville Police Department, testified that he responded to the shooting scene and supervised securing the area. The defendant told Sergeant Lawson that he had been staying with his ex-wife, that a man assaulted him with a bat, and that the defendant shot him.

Mrs. Barbara Harrison stated that she lived directly across the street from Ms. Felts. On May 5, she had seen the defendant arrive at Ms. Felts' house at approximately 9:00 a.m. The defendant appeared agitated and was knocking on Ms. Felts' front and back doors. The defendant left and returned later in the day. The defendant repeated his actions of knocking on Ms. Felts' doors and then sat in his truck a short time. The defendant then entered the back door of the residence. Later, Mrs. Harrison saw the defendant coming out of Ms. Felts' house holding his hands up with the appearance that "something was very wrong." She saw the defendant walk out of sight, then return to her lawn. Other neighbors went to the defendant, then the police and other emergency responders arrived.

Mr. Geoffrey Brown stated that he lived in the neighborhood of Ms. Felts. While walking outside on May 5, he heard someone groaning in pain. Upon investigating, Mr. Brown saw the defendant, who was bleeding and in distress. Mr. Brown questioned the defendant on what happened to him. The defendant told him that he could not stand his ex-wife being in the house with another man. The defendant pointed out to Mr. Brown where the gun lay at the street corner.

Ryan Brown, the son of Geoffrey Brown, testified that he also saw the defendant on May 5. The defendant told Ryan Brown, "I couldn't stand him being in there with her. I shot him five or six times." On cross-examination, Ryan Brown said the defendant also told him that the man had hit him with a baseball bat.

Detective Dirk Witherow was the lead investigator in this case. He visited the defendant at Vanderbilt Hospital to take photographs and to perform a gunshot residue test. The defendant refused to make a formal statement but volunteered that he did not mean to shoot the victim, but the victim "came at him with a bat."

On cross-examination, Detective Witherow said the victim had told him that he only hit the defendant once with the bat. Detective Witherow stated that he knew the defendant was hit more than once.

The State then rested. The defendant produced one witness, the defendant's daughter who was not present during the incident. After voir dire, the defendant chose not to testify and the defense concluded.

## ANALYSIS

The defendant, in this appeal of his convictions, poses the following issues:
1) The evidence was insufficient to support the convictions;
2) The trial court erred in refusing to instruct the jury as to the termination of periodic tenancy, T.C.A. § 66-28-512;
3) The trial court erred in refusing to allow the introduction of the victim's statement;
4) The defendant was not properly advised of his right to testify; and
5) The trial court erred in allowing the introduction of other crimes and bad acts by the defendant.

### Sufficiency of the Evidence

The defendant challenges both convictions, alleging that the State failed to prove an essential element in each offense. Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn . 1978). Questions concerning witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In order to prove first degree murder, it must be shown that the defendant, with premeditation, intentionally killed another person or, in this instance, attempted such a killing. See T.C.A.§ 39-13-202(a)(1). As used in this definition, "'premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation." Id. at (d).

The determination of whether a defendant acted with premeditation is a jury question, and it may be inferred by the manner and circumstances of the killing. State v. Holder, 15 S.W.3d 905, 914 (Tenn. Crim. App. 1999). Factors which tend to support the existence of premeditation are: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). The infliction of multiple wounds is also a factor indicating premeditation. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

Viewing the evidence and inferences therefrom in a light most favorably to the State, we conclude that sufficient evidence was present to convict the defendant for attempted first degree murder. The defendant contends that evidence of premeditation was insufficient. However, the evidence showed that the defendant, on several occasions, threatened the victim with physical harm. The defendant armed himself with a loaded weapon and entered the house with a key that he was unauthorized to possess. Upon entry, the defendant was focused on the victim and pursued him into another room. The previously unarmed victim acquired a bat and attacked the defendant. The evidence showed that the defendant fired seven rounds, hitting the defendant four times. A witness, who saw the defendant shortly after the shootings, quoted the defendant as saying, "I couldn't stand him being in there with her. I shot him five or six times." Under these factual circumstances, sufficient evidence of premeditation was evinced to support the jury verdict. We will not disturb the findings of the jury.

The defendant next asserts that the defendant enjoyed a periodic (month to month) tenancy at Ms. Felts' house subject to the Uniform Residential Landlord and Tenant Act. T.C.A. § 66-28-512. This, the defendant contends, vested him with a lawful right to be on the premises and thus removes an essential element of the offense of aggravated burglary.

A conviction for aggravated burglary requires proof that the defendant entered a habitation without the effective consent of the property owner with the intent to commit a felony, or attempts or commits a felony. T.C.A. § 39-14-402, -403. "The focus is on whether the property owner consented to the entry and the defendant's purpose for entering." State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999).

The defendant contends that his monthly rent payments entitled him to entry on the premises. However, the evidence showed that the defendant had enjoyed only limited privileges of entry. The owner, Ms. Felts, had not provided the defendant with a key and had, three days before the incident, placed the defendant's possessions outside. There is a statutory prescription to determine possessory rights of property. T.C.A. §§ 29-18-101, -102. The defendant, however, chose to enter by the use of an unauthorized key and by brandishing a loaded weapon.

Requested Jury Instruction

The defendant next contends that the trial court erred by refusing to instruct the jury on the termination of a periodic tenancy under the Uniform Residential Landlord and Tenant Act, T.C.A. § 68-28-512, and its application to the facts of this case. After careful review, we respectfully disagree.

The function of a special instruction is to correct mistakes or omissions made in the general charge; to present a material question not treated in this general charge; or to limit, extend, eliminate, or, more accurately, define a proposition already submitted to the jury. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001); Chesapeake, O & S.W.R. Co. v. Foster, 88 Tenn. 671, 13 S.W. 694, 694 (1890). This court must review the entire jury charge; we can find error only if, when read as a whole, the charge fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

As previously discussed herein in the analysis of the sufficiency of the evidence, the defendant attempted to use the Uniform Landlord and Tenant Act as a defense against the charge of aggravated burglary. Essentially, the defendant contends that he was a periodic tenant based on his payment of what both he and the owner, Ms. Felts, characterized as "rent." The tenant had not formally been served with notice of termination pursuant to the statute. Therefore, the defendant contends that he was entitled to enter the premises without the owner's consent.

As we noted before, the focus of the aggravated burglary is on whether the owner consented to the entry and on the defendant's purpose for entering. Langford, 994 S.W.2d at 128. "Owner" is defined as a person in lawful possession of property. T.C.A. § 39-14-401(3). The evidence was uncontradicted that Ms. Felts was the owner. Whatever privileges the defendant acquired by his payments, they were obviously limited. The owner, Ms. Felts, had intentionally not furnished the defendant with a key. On the day of this incident, the defendant did not have Ms. Felts' effective consent to enter. Under these circumstances, the requested instruction would have served no enlightening purpose but, instead, would have potentially injected confusion into the deliberative process. Our review of the entire jury instruction revealed that the charge provided fairly submitted the legal issues. The refusal to give the requested instruction was proper.

The Victim's Statement

The defendant next alleges error by the trial court in its refusal to allow the defendant to introduce the complete transcript of a statement given to Detective Witherow by the victim. Following the victim's testimony at trial, he was cross-examined concerning certain inconsistencies between his testimony and the earlier statement. The defendant then moved to introduce the transcribed statement in its entirety into evidence. The trial court refused this request. The defendant now asserts that the statement should have been introduced under the rule of completeness and cites to State v. Belser, 945 S.W.2d 776, 785 (Tenn. Crim. App. 1996). Belser, however, was

concerned with the failure of the trial court to allow inquiry about the context of inconsistent statements and not the introduction of the statement.

In the instant case, the defendant was not limited in his inquiries concerning the inconsistencies. There had been no attempt by the State to introduce a portion of the statement or to mislead the jury concerning its contents or context. We conclude that the proferred statement was properly excluded.

### Momon Hearing

The defendant alleges that he was denied his constitutional right to testify because procedural guidelines of Momon were not followed. Specifically, the defendant now contends his waiver was not knowingly, intelligently, and voluntarily made; that defense counsel induced him not to testify; and that the trial judge played an improper role in the questioning.

To ensure that criminal defendants are not deprived of their fundamental right to testify, our supreme court in Momon v. State, 18 S.W.3d 152 (Tenn. 1999), set forth a procedure to be followed when the defendant does not testify. The hearing, in the presence of the trial judge, requires no particular litany. Id. at 162. The Court described the minimal requirements to be elicited:

(1) the defendant has the right not to testify and, if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that, if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; the defendant has been advised of the advantages and disadvantages of testifying; and the defendant has voluntarily and personally waived the right to testify.

Id.

The trial judge should play no role in the procedure but may question the defendant to the extent necessary to ensure a valid waiver. Id.

The examination of the defendant by his trial counsel was as follows:
BY MR. PHILLIPS:
Q.      You're Zillon Felts?
A.      Yes, I am.
Q.      You're my client in this case?
A.      Yes, sir.
Q.      Charged with two very serious offenses, attempted first-degree murder and
        aggravated burglary?
A.      Yes.

Q. You and I discussed these offenses on many occasions, these allegations against you?

A. Yes.

Q. You and I have discussed the fact you have the right to testify or not to testify?

A. Yes, sir.

Q. And you're aware that if you do not testify, it cannot be – the Judge will instruct the jury that could not be used against you?

A. Yes, sir.

Q. But you're aware that you have every right to get upon the witness stand and tell your story from beginning to finish?

A. Yes, sir.

Q. You and I and Mr. Scott Parsley, our lawyer from Nashville that brought me into the case, we sat down with you about this several times?

A. Yes, sir.

Q. And tell the Judge what our decision is, you and me and Scott Parsley and particularly you?

A. Our decision, and they did give me the final decision, was not to testify.

THE COURT: Is that your final and are you comfortable with that decision?

THE DEFENDANT: Yes, ma'am.

THE COURT: All right. Thank you.

In our view, the examination was within the minimal requirements of <u>Momon</u>. The defendant demonstrated that he was aware he was waiving an important right after a thorough discussion with his attorneys. The defendant also clearly indicated that it was his decision to refrain from testifying. The single question posed by the trial court at the conclusion of the hearing does not cast an unflattering light on the defendant's right not to testify. Accordingly, we find no merit in this issue.

Evidence of Other Crimes

In his final issue, the defendant claims error by the trial court in allowing testimony concerning apparent marijuana and rolling papers which were seized from the defendant's vehicle. The defendant argues that the trial court should have conducted a hearing pursuant to Tennessee Rule of Evidence 404(b). The State responds that the evidence was introduced without objection by the defendant and, therefore, was waived pursuant to Tennessee Rule of Appellate Procedure 36(a).

The record reveals that the defendant made no contemporaneous objection to the evidence nor was a pre-trial motion in limine filed regarding this evidence. We are therefore unable to review the issue due to the defendant's effective waiver by failure to take action available to prevent or nullify the harmful effect of the error. Tenn. R. App. P. 36(a); <u>State v. Alder</u>, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001).

Conclusion

Our review has failed to reveal any reversible error in the record. Accordingly, the judgments of conviction are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE